### GERMANIA IRON CO. v. JAMES et al.

#### (Circuit Court of Appeals, Eighth Circuit. October 10, 1898.)

#### No. 1,047.

**1. PUBLIC LANDS—RULES OF PROCEDURE IN LAND DEPARTMENT.**

The "land department of the United States (including in that term the secretary of the interior, the commissioner of the general land office, and their subordinate officers) constitutes a special tribunal, vested with the judicial power to hear and determine the claims of all parties to the public lands which it is authorized to dispose of"; and it is essential to the impartial exercise of such power that rules and regulations should be adopted, and steadily maintained, establishing a uniform practice and method of procedure. The legislation of congress gives ample power for the establishment of such rules, and when promulgated they become a law of property, and cannot be ignored by the department, to the subversion of rights acquired under them.[1]

**2. SAME—RULES GOVERNING CANCELLATION OF ENTRIES—WHEN DECISION BECOMES EFFECTIVE.**

An established rule of practice of the land department, that after a decision by the secretary has been made, canceling an entry of public lands, no subsequent entry of such lands can be made until the decision has been officially communicated to the local land officers, and a notation of the cancellation made on their plats and records, is a proper, just, and reasonable rule, and in accordance with the policy of congress, which makes the local offices the place for the initiation and establishment of all claims under its laws, as is also a rule that applications for entry can only be received by the local officers at their offices, and during the prescribed office hours; and an application for entry made and received in accordance with such rules at the first opening of a local office after the receipt and notation on its records of the cancellation of a former entry gives the entryman a vested right in the land, of which he cannot be deprived by a subsequent decision of the department giving preference to an application made, in violation of its rules, after office hours, and before official notice of the cancellation had been received at the local office, and which the officers for that reason rejected. 82 Fed. 807, reversed.

**3. SAME—REVIEW OF DECISION OF LAND DEPARTMENT BY COURTS—ERROR IN LAW.**

Neither the secretary of the interior nor the commissioner of the general land office has power to make a retroactive decision abrogating

---

[1] As to decisions of land department, their conclusiveness and effect, generally, see U. S. v. Winona and St. P. R. Co., 15 C. C. A. 96, 107, 67 Fed. 948, 959, and note to Hartman v. Warren, 22 C. C. A. 38, and supplementary note by same title to Carson City Gold & Silver Min. Co. v. North Star Min. Co., 28 C. C. A. 344.

rules of the land department; and such a decision, giving preference to an application made in violation of the rules in force when it was made, over an entry made in accordance with such rules, is an error in law reviewable by the courts.

4. SAME—SUIT TO REVIEW DECISION—SUFFICIENCY OF PLEADING.

An allegation in a bill that at the time of a land entry there was in force in the land department "a rule and regulation and a settled practice" to the effect stated is sufficient on demurrer.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This is an appeal from a judgment which sustained a demurrer to a bill brought to devest the title to certain land in section 30, township 63 N., of range 11 W. of the fourth P. M., in the state of Minnesota, from the appellees, Houghton E. James and others, and to vest it in the appellant, on the ground that through an error in law the secretary of the interior caused a patent to this land to be issued to one Craig, from whom the appellees derived their claim, when, in the absence of that error, he would have directed its issue to Emil Hartman, who has conveyed his right to the land to the appellant, the Germania Iron Company. These are the essential facts alleged in the bill: On February 18, 1889, the land in question had been segregated from the public domain, and appropriated to private use, by the location of Sioux half-breed scrip upon it. A contest had arisen between the locator of the scrip and one who subsequently applied to pre-empt the land, had been heard by the local land officers at Duluth, Minn., and was pending on appeal before the secretary of the interior. On that day the secretary filed an opinion in this contest in his office in Washington, in which he adjudged that the location of the scrip was invalid, that the attempted pre-emption was fraudulent and void, and that the land in question was thus left open to disposal under the public land laws of the United States applicable thereto. There was then "in force in the department of the interior a rule and regulation, and a settled practice, and a long line of decisions by the department officers, providing and declaring that no decision of the honorable secretary of the interior or the commissioner of the general land office canceling an entry or appropriation of public lands should take effect as a release of such lands from such appropriation, or as a restoration thereof to the public domain open for entry or disposal under the public land laws, until such decision had been officially communicated to the local land officers of the district in which the land should be situate, and until notation of such cancellation had been made upon the plats or other records of the local land office"; and, under the rules and regulations of the land department then in force, the duties of the local land officers were to be discharged in their respective offices, and during the hours devoted to public business. The office hours of these officers were from 9 o'clock in the forenoon until 4 o'clock in the afternoon, and, under the rules and regulations of the land department, no application to make an entry of land could be received by the register or receiver out of office hours. The decision of the secretary was first received by the local land officers at Duluth on the evening of February 22, 1889. On the morning of February 23, 1889, before opening the office for business, the cancellation of the entry of this land with the Sioux scrip was noted on the books and plats of the local land office. At 9 o'clock in the forenoon of that day the office was promptly opened for business, and Emil Hartman was the first person who applied to enter the land after the office was opened, though many applicants entered with him, and presented their applications as rapidly as they could be noted. Hartman applied to locate a Porterfield land warrant upon the land, paid the fees according to law, and his application was duly accepted and allowed by the local land officers. The right and title he thus acquired are now vested in the appellant. The claim of the appellees arises in this way: At about 5 o'clock in the afternoon of February 18, 1889, and again before 9 o'clock of February 19, 1889, Houghton E. James applied to the local land officers at their office in Duluth to make a homestead entry of this land; but his application was re-

jected by the officers, in accordance with the rules and regulations pleaded, because the land was still withdrawn from the public domain by its former entry with the Sioux half-breed scrip. Thereupon a contest arose, and a hearing was had before the local land officers on the merits of the various applications for this land. Appeals were taken from their decisions, and from the subsequent decision of the commissioner of the general land office, to the secretary of the interior; and on December 21, 1894, he decided that, although Hartman was the first person who entered the local land office, and the first person who made application to enter this land, after the decision of February 18, 1889, was officially communicated to the local land officers, and the former entry of the land was canceled, yet the attempted homestead entry of James out of office hours, and before the decision was received by the officers, was valid and effectual, and was entitled to priority over the entry of Hartman. In pursuance of this decision he caused the entry of Hartman to be canceled, permitted James to enter the land as a homestead, and then to relinquish it, and thereupon caused a patent to be issued to one Craig, who entered it with a Porterfield land warrant when James relinquished, and afterwards conveyed one-half of it to James, and granted leases to some of the other appellees. The bill charges that the secretary of the interior fell into an error in law, in this: that he held that the decision of February 18, 1889, restored the land to the public domain instanter, subject to disposal and entry before the decision was received by the local land officers, before the location of it with the Sioux scrip had been canceled on the plats and books of the land office, and out of office hours, contrary to the rules, regulations, and practice of the land department of the United States. The court below was of the opinion that there was no error in this ruling, and accordingly dismissed the bill.

Walter Ayers, for appellant.

James K. Redington (Warren W. Draper, on brief), for appellees.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

SANBORN, Circuit Judge (after stating the facts). The "land department of the United States (including in that term the secretary of the interior, the commissioner of the general land office, and their subordinate officers) constitutes a special tribunal, vested with the judicial power to hear and determine the claims of all parties to the public lands which it is authorized to dispose of." 9 Stat. 395, c. 108, § 3; Rev. St. pp. 441, 453; U. S. v. Winona & St. P. R. Co., 15 C. C. A. 96, 103, 67 Fed. 948, 955, and 32 U. S. App. 272, 283. It is a part of the daily business of that tribunal to hear evidence and argument, and to decide who has, by purchase, by pre-emption, by the location of scrip or land warrants, or by any other recognized mode, established a right to any part of the public domain. It has determined thousands of such controversies, and the title to millions of acres of land rests upon its decisions. Every judicial tribunal upon which the duty of determining many and varied contested rights is imposed finds it necessary to establish and to steadily maintain a uniform practice and method of procedure for the commencement and conduct of contests before it. It is perfectly obvious that even-handed justice to all litigants can be impartially administered in no other way. Take the case in hand. The question it presents is whether strangers to a contest, in which a decision of the secretary of the interior was filed in his office in Washington to the effect that a certain entry of the land in question was illegal, and

should be canceled, and that the land should be left open to disposal under the public land laws of the United States, had the right to enter that land at Duluth, in the state of Minnesota, the moment that decision was filed in Washington, or' had no such right until the local land officers had received the decision, and had canceled the former entry on their plats and records where it was made. The title to the land hinges on the decision of this question. The acts of congress do not answer it. Obviously, unless the land department had established some rule or practice on the subject, the question might have been answered in one way in one case, and in another way in another case; and the rights of entrymen would have been left to the arbitrary and whimsical discretion of the officers before whom their cases happened to arise, without law or rule to guide them. Such a deplorable condition of affairs would have been in conflict with the fundamental principles of civilized government, which attempts, by a uniform administration of law, to secure equal rights to all, free from the arbitrary and whimsical will of any. The subject-matter of this rule and practice was therefore one which it was eminently fitting and proper that the land department should regulate by rule or practice, to the end that the determination of the rights of entrymen should be just and uniform. The acts of congress gave ample power to the officers of the land department to make a rule, and to establish and maintain a uniform practice upon this subject. Rev. St. §§ 453, 2478. The rule and practice which the bill alleges that the land department had established was reasonable and just. It was that, after a decision of the secretary had been rendered that a former entry was void and should be canceled, no subsequent entry of the land could be made until that decision was officially communicated to the local land officers, and a notation of the cancellation was made on their plats and records. The secretary of the interior is an appellate tribunal in these cases, whose court is held, and whose decisions are filed, more than 1,000 miles from most of the inferior tribunals in which the parties appear and institute and try their contests. It is according to the almost universal practice of judicial tribunals for the inferior court to take no action, and to allow none to be taken in it, until the decision and order of the appellate court has been officially received and recorded. The reasons for such a rule in the land department are far stronger and more imperative than in the ordinary courts of law or equity. It is in the local land office that the rights of the entrymen must be initiated as well as contested. The policy of the government is to afford to the actual settlers, to the pre-emptors and homesteaders, to those who live on or near the public land to be disposed of, every facility to acquire it without burdensome expense or unnecessary trouble. The very existence of the local land offices is the outgrowth of the purpose of congress to carry to the residents of the districts in which the lands are situated, not only the tribunals in which they may initiate and try their rights to obtain portions of the public domain, but all the information to enable them to intelligently prefer and establish their claims. To this end, the surveyor of each district is required to transmit to the registers and receivers of the local land offices general and particular

plats of all lands surveyed in their respective districts, and these reg
isters and receivers are required to keep a record of all entries and
cancellations on these plats and in their books, so that any applicant
for land may there learn when it is open for entry. To this end, these
plats and records in the local land office are declared to be open
to public inspection, and the register and receiver are charged with
the duty of giving correct information regarding them to every in-
quiring applicant. To this end, applicants to enter the public land
may not make their entries or institute their proceedings to obtain
them in the general land office at Washington, but must first apply
to the local land office of the district in which the lands are situated.
2 Stat. 73, c. 55, §§ 7, 8; Rev. St. §§ 2223, 2295, 2247. In view of
this legislation, that would indeed be a strange rule, glaringly incon-
sistent with the evident intention of congress in establishing local
land offices, and with the express provisions of the acts by which
they established and developed the land department, which would
make the rights of applicants to acquire land more than 1,000 miles
from Washington depend on action upon a decision filed there, in a
contest to which they were strangers, before it was officially com-
municated to the officers of the local land office, or generally known
to the public. Such a rule would enable a sentinel in the office of
the secretary of the interior to secure for himself, and to deprive
the citizens of the vicinage of, every valuable tract of land restored
to the public domain by such a decision, while it would offer patent
opportunities for the play of secret and mischievous machinations
that might well be avoided. It is the converse of such a rule and
practice—it is the rule and practice that the land remained with-
drawn from entry or sale until the decision of the secretary was offi-
cially made known to the local land officers, and the notation of the
cancellation of the former entry was made on their plats and records—
which the bill alleges was in force when the decision of February 18,
1889, was filed. That practice was consistent with the purpose and
provisions of congressional legislation on the subject, gave equal
opportunities to all applicants, brought the necessary information
to the local land officers in time to enable all who intended to apply
for the land to obtain and act upon it without expense, and was fair,
fitting, just, and reasonable.

An attempt is made to escape from the effect of this practice on the
ground that the averments of this rule and practice in the bill are
mere conclusions of law, that there is consequently no admission
of their existence by the demurrer, and that it is for this court to
consider and decide whether or not such a rule or practice ever ex-
isted. The allegation is, however, that there was in force "a rule
and regulation and a settled practice, and a long line of decisions by
the department officers" to the effect which we have repeatedly stated.
Conceding that the allegation of the long line of decisions, if it stood
alone, might be met upon this demurrer by counter decisions of the
department officers, the averment of the rule and practice is clearly
sufficient, and stands uncontroverted. The suggestion that the alle-
gation concerning them is insufficient because the rule is not stated
by number, or by reference to any publication of the department, and

that the practice is not alleged in greater detail, is not entitled to serious consideration. Both the rule and the practice are succinctly and clearly set forth in the bill, and, if greater particularity was desired, the remedy was not a demurrer. The rule and practice then stand conceded, and there have been some decisions of the secretary of the interior to the effect that they existed. Crystal v. Dahl, Copp, Pub. Land Laws (1875) 363; Eno v. McDonald, Id.; Jayne v. Gowdy, Id. (1882) 652. If there have been decisions to the contrary, that fact establishes nothing, under the admission made by the demurrer, except that the case at bar is not the only one in which the secretary has wrongfully permitted the rule to be violated and the practice to be disregarded.

It is insisted that the closing words of the decision of February 18, 1889, abrogated the rule, abolished the practice, and opened the land in question in this case to entry at once. We are unable to so interpret them. They were: "This * * * leaves the land in question open to disposal under the public land laws of the United States applicable thereto, and such is the judgment of this department." It may or may not be that, as between·the parties to the contest which resulted in this decision, it took effect as.the judgment of the department when it was filed. That is not the question before us. The question here is whether this decision left the land in question open to disposal to strangers to the contest and decision, in accordance with, or in violation of, the rule and practice of the department. About this there ought not to be two opinions. If a judge decides a case, and orders a judgment or decree to be entered, or any other act to be done,·in his court, according to law, or under a certain statute, it goes without saying that it is to be done according to, and not in disregard of, the rules and practice of the court; and there is nothing in the terms of this decision to indicate any other intention. When it reached the register and receiver at Duluth, they found nothing of that character in it, and they followed the established rule and practice in the usual way, persisted in their rejection of the application of James, made before it was received, and before the former entry was canceled, and accepted the application of Hartman, which was the first made after the receipt of the decision and the cancellation of the former entry. In our opinion, their construction was right, and their action was in accordance with the obvious and true meaning of the final clause of the opinion.

The case therefore stands in this way, under the bill and the demurrer to it: When the decision of February 18, 1889, was filed in the secretary's office at Washington, there was a rule and a settled practice of the land department that no application to enter or to appropriate land withdrawn from disposal by a prior entry which was adjudged void by such a decision could be accepted until after the decision had been officially made known to the local land officers, and they had noted a cancellation of the former entry on their books. The register and receiver followed the rule and practice, and accepted the first legal application which·was made after the decision was ·received. Notwithstanding these facts, the secretary of the interior held on December 21, 1894, five years afterwards, that a prior appli-

cation to enter the land, made on February 19, 1889, in violation of the rule and practice of the department, was superior in right to that of the first applicant after the receipt of the decision, caused the entry of Hartman to be canceled, and patented the land to another, when he would have caused it to be patented to him if he had not so held. This ruling was clearly an error in law, and it entitles the appellant to the relief it seeks. Bogan v. Mortgage Co., 11 C. C. A. 128, 130, 63 Fed. 192, 195, and 27 U. S. App. 346, 350, and cases there cited. The reasonable and established rules and practice of judicial tribunals become as much a part of the law of the land as the statutes under which they act. Witness the innumerable reversals of the trial courts for errors of law in deciding questions of practice which crowd the reports of the appellate courts. Moreover, the rule and practice here under consideration stand upon far higher ground than the ordinary rules for the mere conduct of proceedings in courts. They condition the inception, the foundation, the very existence, of all rights and title to this land. Rights initiated in accordance with them became vested interests in property, and attempts to establish rights in violation of them were as though they had not been. They had become an established rule of property, upon which men relied and had the right to rely. The maxim, "Stare decisis, et non quieta movere," applies nowhere more universally, or with more salutary effect, than to those rules and that practice under which property is acquired or secured. It is often far more important that these should be certain and changeless than that they should be right. Men engage in business occupations, buy, sell, and contract, in reliance upon them. Lawyers advise their clients and enforce and protect their rights with constant reference to them, and while all interests will readily adjust themselves to, and protect themselves under, erroneous rules, there is neither protection nor safety for any interest under shifting rules. Shreve v. Cheesman, 16 C. C. A. 413, 419, 69 Fed. 785, 791, and 32 U. S. App. 676, 687; Seale v. Mitchell, 5 Cal. 401, 403; Bates v. Relyea, 23 Wend. 336, 341; Goodell v. Smith, 20 Johns. 693, 722.

Nor was it within the supervisory power of the secretary or of the commissioner to set aside or annul rights acquired under this rule and practice, or to deprive Hartman of his title to this land, by a retroactive decision, made five years after his right to it had vested, to the effect that the established rule or practice when he made his entry was either inconvenient or erroneous. They might undoubtedly have made and promulgated a new rule which would have governed cases arising after a new rule of practice had been made and had become known, but Hartman and the other applicants who crowded the offices of the register and receiver of the land office at Duluth at 9 o'clock in the forenoon of February 23, 1889, at the earliest moment when this land could be entered, according to the then established and known rule and practice of the department, had the right to the determination of their claims according to the practice as it then existed. Retroactive decisions of judicial tribunals are as vicious and ineffectual as retroactive laws. Shreve **v.** Cheesman, 16 C. C. A. 413, 419, 69 Fed. 785, 792, and 32 U.

S. App. 676, 689. System, order, and the uniform application of the laws, the rules, and the practice to all litigants alike, are as essential to the administration of justice in the land department as in the courts. Doubtless every applicant for this land, but one, relied upon the settled practice of the department, and presented his application for it at 9 o'clock in the forenoon on February 23, 1889; yet that one who violated the rule and practice, and made application to the officers out of office hours, and before the land was open for entry under the practice of the department, has defeated all the others. He who came in by some other way has defeated every applicant who came "by the door." What a farce the attempt to secure rights in any judicial tribunal must become, if its rules and practice are ignored or applied at the arbitrary will of the judge who presides over the court! Under such an administration of the land department, the rights and titles which the law attempts to protect and secure would become naught but privileges dependent upon the gracious favor of its officers. The power to degrade them to this rank cannot be found in the supervisory authority of the secretary or of the commissioner. Their power of supervision is not unlimited or arbitrary. "It cannot be exercised so as to deprive any person of land lawfully entered and paid for. By such entry and payment the purchaser secures a vested interest in the property, and a right to a patent therefor, and can no more be deprived of it by order of the commissioner than he can be deprived by such order of any other lawfully acquired property. Any attempted deprivation in that way of such interest will be corrected whenever the matter is presented so that the judiciary can act upon it." Cornelius v. Kessel, 128 U. S. 456, 461, 9 Sup. Ct. 122; Bogan v. Mortgage Co., supra. The decree below must be reversed, and the case must be remanded to the court below for further proceedings not inconsistent with the views expressed in this opinion.