### ROBINSON et al. v. LUNDRIGAN.

(Circuit Court of Appeals, Eighth Circuit. March 23, 1910.)

No. 3,171.

1. PUBLIC LANDS (§ 35*)—HOMESTEAD ENTRY—SOLDIER'S CERTIFICATE.

Where complainant applied to enter public land, with a void soldier's additional certificate, and his invalid application was rejected, such application was not an entry of the land, but a mere application to enter, and, having been rejected, complainant was not entitled to additional time within which to obtain another right with which to enter the land as against the holder of a valid application for the land received and pending at the time complainant made his application for additonal time.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 35.*]

2. PUBLIC LANDS (§ 35*)—SOLDIER'S ENTRIES—LAND DEPARTMENT RULES.

Act March 3, 1893, c. 208, 27 Stat. 593 (U. S. Comp. St. 1901, p. 1416), provides that where soldier's additional homestead entries have been made or initiated on the certificate of the Commissioner of the General Land Office of the right to make such entry, and there is no adverse claimant, and the certificate is found invalid for any cause, the purchaser, on making proof of such purchase, may perfect his title by paying the government price for the land. Held, that the statute confines the right to purchase the land to cases where homestead entries have

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

been made or initiated on a certificate of the Commissioner of the General Land Office of the right to make such entry, and then only in cases where there is no adverse claimant, and that the department therefore has no power to make a rule cutting off the right of an adverse claimant.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 35.*]

Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Minnesota.

Bill by John E. C. Robinson and others against John E. Lundrigan. Decree for defendant, and complainants appeal. Affirmed.

C. D. O'Brien (P. H. Seymour, on the brief), for appellants.

Luther C. Harris and William E. Culkin, for appellee.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This was a bill in equity brought by the appellants, who were plaintiffs in the court below, and who will be hereafter referred to as "plaintiffs," against the Santa Fé Pacific Railroad Company and John E. Lundrigan, defendants.

The railroad company filed a disclaimer, and the case proceeded against the appellee alone, who will be hereafter referred to as the "defendant."

The purpose of the bill as disclosed by the prayer was to have the court adjudge: (1) That the plaintiffs were the owners of the land described in the bill and entitled to the legal title thereto; (2) that the defendant be declared to hold in trust for the plaintiffs whatever interest he had in the legal title to the land; (3) that the defendant be commanded and compelled to convey by suitable conveyance to the plaintiffs all such right, title, or interest as he had in the estate.

It appears from the record that John E. C. Robinson, one of the plaintiffs, as assignee of James Carroll, on the 24th of January, 1901, applied at the United States Land Office at Cass Lake, Minn., to make a soldier's additional homestead filing upon the southwest quarter of the southeast quarter of section 13, township 55 north, range 26 west of the Fourth principal meridian. The application was received (but not allowed as an entry), a notation being made upon the records that it was an application, and the papers were forwarded to the General Land Office at Washington for the purpose of examination in connection with the official records, as required by the rules of the Land Department.

On the 23d of March, 1904, the Commissioner of the General Land Office held for rejection the application made by Robinson, as assignee of Carroll, and on the 28th of January, 1905, he directed the register and receiver at Cass Lake to order a hearing, and directed that at said hearing Robinson be allowed to show, if he could, the validity of the Carroll right.

On the 22d of May, 1905, a hearing was ordered for the 29th of June, and a notice was served upon Robinson to appear and offer any evidence he might have, tending to establish the validity of the Carroll

right. On the date fixed for the hearing, Special Agent S. J. Colter appeared before the register and receiver, representing the government; but Robinson failed to appear, either in person or by counsel, and offered no evidence whatever, the only evidence offered at the hearing being the evidence offered by Special Agent Colter.

The register and receiver found that the assignor, James Carroll, has not performed military service in the army, navy, or marine corps of the United States during the War of the Rebellion, and recommended the rejection of Robinson's application. This decision of the register and receiver bears date July 15, 1905.

On the 27th of July, 1905, Robinson filed in the local land office at Cass Lake what he called an "appeal," but which in fact was nothing more than a petition for an extension of time within which to make another application. We say it was not an appeal because he takes no exception whatever to the ruling of the register and receiver. On the contrary, in his appeal, or petition, he says:

"Appellant is deeply sensible and appreciates the seriousness of defaulting at said hearing, and does not ask that the case be reopened. This appeal is not taken for the purpose of hindering or delaying the adjustment of long drawn out matters, but with a hope, and urgent request, that under the circumstances appellant be given 30 days within which to rescrip said above mentioned tract."

On the 29th of August, 1905, J. H. Fimple, Acting Commissioner of the General Land Office, affirmed the decision of the register and receiver, rejected Robinson's application, declared the case closed, and directed the register and receiver to so note upon their records. He further directed them to notify Robinson that he would be allowed 30 days from receipt of notice in which to file a proper substitute for the rejected application.

On the 4th of October, 1905, Robinson, as assignee of one Justus F. Heath, filed a second additional homestead entry upon the land, and this application, like the first, was forwarded to the General Land. Office at Washington for examination and approval. February 15, 1906, the commissioner having found that Heath was entitled to a soldier's additional homestead right for 80 acres under section 2306,. Rev. St. (U. S. Comp. St. 1901, p. 1415), and that Robinson had properly acquired, by assignment, the right to 40 acres thereunder, directed the register and receiver at Cass Lake, on payment of the legal fee and commissions, to allow the entry in the name of Robinson as assignee of Heath and to issue the original and final receipts and final certificate. March 2, 1906, Robinson paid the fees and commissions, and on the same date the final certificate was issued to him.

July 11, 1905, the Santa Fé Pacific Railroad Company applied to select the same land under Act June 4, 1897, c. 2, 30 Stat. 36 (U. S. Comp. St. 1901, p. 1541). The application was received by the local land office subject to Robinson's soldier's additional application under the James Carroll assignment. This application was made 18 days after the hearing at which Robinson failed to appear, 4 days prior to the decision by the register and receiver therein, and 12 days before Robinson filed his application for an extension of time within which to rescrip the land.

At the time the final certificate to Robinson was issued by the local land officers, they rejected the application of the railroad company. Upon receiving notice thereof the railroad company appealed. June 14, 1906, the Commissioner of the General Land Office reversed the findings of the register and receiver and held Robinson's entry and final certificate for cancellation. Robinson then appealed to the Secretary of the Interior, where the decision of the commissioner was affirmed. A petition for a rehearing was filed by Finnegan, a grantee of Robinson's, but was denied by the Secretary. On July 20, 1908, a patent for the land in controversy was issued to the Santa Fé Pacific Railroad Company, and on the 18th day of November, 1908, the Santa Fé Pacific Railroad Company sold and conveyed the land to the defendant, John E. Lundrigan.

The validity of the application made by the Santa Fé Pacific Railroad Company is not questioned, and the record shows that it was pending and had been pending almost three months at the time Robinson's application under the Heath soldier's additional homestead right was filed. Neither is it anywhere insisted by the plaintiffs that the Carroll soldier's additional right was ever at any time a valid right; indeed, its invalidity was fully recognized by Robinson, if not in words certainly by his acts. He did not appear at the hearing after due notice, neither did he apply to the local land officers to have the hearing postponed, if, for the reason stated by him, he could not attend at the time fixed for the hearing, nor did he make any effort whatever to sustain the validity of the Carroll right, and, in his petition to the commissioner for an extension of time "within which to rescrip" the land, expressly states that he "does not ask that the case be reopened," thus recognizing, as the department held, that it was absolutely void.

The question is thus presented whether or not a person who applies to enter public land with a void soldier's additional right is entitled, after his invalid application has been rejected, to a grant of additional time within which to obtain another right with which to enter the land where a valid application for the land has been received, and is pending, at the time the holder of the invalid right makes his application for additional time.

It is to be observed, in considering this question, that an application under soldier's additional scrip is not an entry of the land, but merely an application to enter. In Ex parte John C. Ferguson (not reported), where the facts were identical with the facts in the case at bar, the secretary said:

"Since the case of Stewart v. Peterson, 28 Land Dec. Dep. Int. 515, the department has held that any application presented during the existence of an entry of record must be rejected outright, and that no rights can be recognized as having been acquired by the presentation of an application to enter at such time. But the case at bar is different. There was no entry of the tract described, and there is none now. McBean presented an application to enter. It was forwarded to your office for consideration and there rejected. His application was simply tentative, and the most that it can be held to have done, as has been often decided, was to protect any rights that he might have as against other applicants, or, in the words used in the books, it was equivalent to an entry only so far as his rights were concerned. Therefore, there is no good reason apparent why the application of Ferguson should not have been held to await that of McBean. As it appears that the

latter had no rights, he consequently took nothing by his application, and his appeal from the decision rejecting his application, of course, placed him in no better position. This being so, that application should be no bar to the allowance of the application of Ferguson."

The Land Office Circular in force at the time this application was made provides that an additional entry not accompanied by a certificate of right from the General Land Office (and this entry was in that form) must be forwarded by the local office to the General Land Office for consideration and for instructions relative to allowing the entry. It further provides that proper notations should be made by the local officers on their records, showing the pendency of the application and the consequent segregation of the land, the legal effect of which is to give the applicant the preference right to enter the land in case the additional homestead is found to be valid. No fees or commissions are required or paid at the time the application is filed. If, after examination by the General Land Office, the soldier's additional application is found to be valid, the register and receiver are directed to allow the entry and to collect the fees and commissions as in cases of original entry. When this is done the receiver issues his receipt therefor and the register his final certificate.

There is a material difference between soldier's additional homestead scrip and military bounty land warrants, state school indemnity land selections, Sioux half-breed scrip, and other land scrip of like character, in that, the several kinds of scrip last mentioned are examined by the department and their validity certified prior to location. The location of the scrip, therefore, constitutes an entry, and the rules governing such scrip are not applicable to soldier's additional scrip for the reason that in the one case filing the scrip in the local land office constitutes an entry, while, in the other, filing the scrip in the local land office constitutes an application only and cannot become an entry until specially authorized by the Commissioner of the General Land Office. The cases, therefore, called to our attention at the argument, and in the brief of plaintiff, involving military bounty land warrants and scrip of like character, are not in point.

It is not insisted, and indeed could not be, that the statute itself authorizes an extension of time in case of a void application. Section 2306 of the Revised Statutes, by which the soldier's additional right is created, reads as follows:

"Every person entitled under the provisions of section 2304 to enter a homestead who may have heretofore entered under the homestead laws, a quantity of land less than one hundred sixty acres shall be permitted to enter so much land as, when added to the quantity previously entered, shall not exceed one hundred sixty acres."

It is to be noted that this right is granted by the statute only to persons entitled under the provisions of section 2304 (page 1413), to enter a homestead, and the department found, upon the evidence submitted, that James Carroll, Robinson's assignor, had not rendered military service and was not entitled to exercise the right, and as Robinson, the assignee, acquired and could acquire only such rights as his assignor had, he got nothing by his purchase and no right of entry could be based thereon.

It is, however, insisted by the plaintiffs that there was a rule and practice prevailing in the department which authorized the extension of time in such cases, and they direct our attention to the case of Robeson T. White, 30 Land Dec. Dep. Int. 61, and Land Office Circular dated February 18, 1890, in support of their contention.

In the case of Robeson T. White, White initiated a contest against a previous entry by McCrimmon and was successful; McCrimmon's entry being canceled October 14, 1898. On the same day White, assignee of Winifred Carver, widow of George W. Carver, made application to make additional homestead entry for the land, under section 2306 of the Revised Statutes. White had a preference right to make the entry under section 2 of Act May 14, 1880, c. 89, 21 Stat. 140 (U. S. Comp. St. 1901, p. 1392), as successful contestant against a former entry. September 9, 1899, William Moran filed a protest against the application, which was rejected, and in October, 1899, White filed a second additional homestead application as assignee of Jacob Pugh on the same land.

As a reason for offering the Pugh additional application, White, in his affidavit, stated:

"Affiant was advised by counsel that there seemed to be an infirmity in the Carver right. * * * Desiring to retain and assure his right to said land and the exercise of his preference right of entry thereon, * * * and to evidence his good faith, * * * he procured the soldier's additional homestead certificate of Jacob Pugh and filed same. * * * with an application to locate the same on the land described, to the end, and to no other, that, should an incurable infirmity be found in said Carver right, the said Pugh certificate might be taken and used in whole or in part as the consideration for the exercise of his preference right. He had no purpose, in so filing the said Pugh certificate, of abandoning his first application nor any right obtained thereby; on the contrary, he did it for the express purpose of retaining and maintaining his preference right to the entry."

Upon examination it was found that the first application under the Carver right was a valid one, and the department properly held that by making the second application under the Pugh right he did not waive any right acquired by the first application under the Carver right. In disposing of the question, the secretary said:

"To constitute a waiver of right, one must, with full knowledge of his right, do or forbear doing something inconsistent with the right and of his intent to rely upon it." Bennecke v. Connecticut Mutual Life Insurance Company, 105 U. S. 355, 26 L. Ed. 990; Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420.

The distinction between that case and the case at bar is at once apparent. The question of the right to substitute a valid for an invalid right was not involved in the White Case. The statute gave him a preference right as the successful contestant, and his offer to pay for the land by the tender of soldier's additional scrip was merely in aid of that right; moreover, the scrip which he tendered was found upon examination to be valid.

Neither do we think the circular of February 18, 1890, tends to support the contention of counsel. It makes no reference whatever to the right of substitution, and the reason therefor is at once apparent when we examine Act March 3, 1893, c. 208, 27 Stat. 593 (U. S. Comp. St. 1901, p. 1416), which provides:

"That where soldier's additional homestead entries have been made or initiated upon a certificate of the Commissioner of the General Land Office of the right to make such entry, and there is no adverse claimant, and said certificate is found erroneous or invalid for any cause, the purchaser thereunder, on making proof of such purchase, may perfect his title by payment of the government price for the land."

It will be noticed that the statute confines the right to purchase the land to cases where homestead entries have been made or initiated upon the certificate of the Commissioner of the General Land Office of the right to make such entry, and then only in cases where there is no adverse claimant. In view of this statute, the department had no power to make a rule which would cut off the right of an adverse claimant, and after diligent search we have been unable to find a single case where it has attempted to do so. Numerous cases may be found where the department has permitted the substitution of valid for invalid rights; but on examination of these cases it will be found that the permission was granted upon the express condition that they did not conflict with adverse rights already pending. There are also cases where there was a valid base—that is, where the assignor, the soldier, had rendered military service and was entitled to soldier's additional scrip, but by reason of some defect therein which might be cured, he or his assignee was allowed to make the correction and the entry sustained—but that is not this case. Here there was no base upon which to establish an entry. Carroll, the alleged soldier, had never performed military service as required by the laws of the United States to entitle him to a soldier's additional homestead entry. His right being void, Robinson got nothing by the assignment, and the commissioner had no authority to give him time within which to substitute a valid right if it conflicted, as it did in this case, with an adverse claim, for the statute provides that this can be done, even upon the commissioner's certificate, only where there is no adverse claimant. The commissioner's letter must be read in the light of the legislation of Congress, and when so read there is nothing found therein inconsistent with the statute. In his letter to the register and receiver he says:

"Your said decision is accordingly affirmed, and the application is rejected and the case closed. You will so note on your records. You will also notify the applicant that he will be allowed thirty days from notice hereof in which to file a proper substitute for the right rejected."

True he did not insert the words if "there is no adverse claimant," but that was unnecessary in view of the statutes and the decisions of the General Land Office. His letter, therefore, was merely authority for the local land officers to receive the second entry under the Heath right in the event that there was no adverse claim. This was the extent of his power, and it is not to be presumed that he intended to go beyond it. In other words, the fact that Robinson had filed a void application was held not to deprive him of the right to file a new and valid application if the land remained open and there was no adverse claimant.

In the case of the Northern Pacific Railway Company v. Charles P. Maginnis, not reported, the Secretary of the Interior said:

"In the absence of an intervening application, there can be no question but that the substitution of another application might be allowed at any time; but it cannot be assumed that with a presentation of a soldier's additional application there is carried a right, in the event the application fails, to substitute another. The substituted application is in reality a new application, and no rights are gained thereunder because of any prior application. An intervening application clearly bars the right of substitution."

Our attention is directed to the case of the Germania Iron Company v. James et al., 89 Fed. 811, 32 C. C. A. 348, wherein this court, speaking through Judge Sanborn, said:

"An established rule of practice of the Land Department, that after a decision by the secretary has been made, canceling an entry of public land, no subsequent entry of such lands can be allowed until the decision has been officially communicated to the land officers, and a notation of the cancellation made on their plats and records."

We have no inclination to depart from or to modify in any degree the rule announced in that case, but the court was there dealing with a very different question from the question here presented. The case was before the court upon a demurrer to the bill. The bill alleged that on February 18, 1889, the land in question had been segregated from the public domain and appropriated to private use by the location of Sioux half-breed scrip upon it. A contest had arisen between the locator of the scrip and one who subsequently applied to pre-empt the land, had been heard by the local land officers at Duluth, Minn., and was pending on appeal before the Secretary of the Interior. The secretary decided that the location of the scrip was invalid, that the attempted pre-emption was fraudulent, and that the land in question was open to disposal under the public land laws of the United States. The decision of the Secretary of the Interior was received by the local land officers on the evening of February 22, 1889, and on the morning of February 23d, before the office was opened for business, cancellation of the entry of this land under the Sioux scrip was noted on the books and plats of the local land office. At 9 o'clock in the forenoon of that day the office opened, and Hartman was the first person who applied to enter the land after the office was opened, and this court held that Hartman was entitled to the land; he being the first in time to apply after a notation of the cancellation had been made upon the plats and records of the local land office.

There was a rule then in force in the Department of the Interior, recognized by a long line of decisions by the department officers, providing and declaring that no decision of the Secretary of the Interior or the Commissioner of the General Land Office canceling an entry or appropriation of public lands should take effect as a release of such lands from such entry or appropriation, or as a restoration thereof to the public domain, open to entry or disposal under the public land laws, until such decision had been officially communicated to the local land officers of the district in which the lands described were contained; and, until notations of such cancellation had been made upon the plats or other records of the local land office, no application or entry could be received. After that had been done the first in line secured the right.

It will be observed that that case, and the cases cited in support of it, were all cases where entry had been made at the local land-office. In the case before us no entry was made, nothing but a mere application to enter had been filed, and in such cases junior applications are received subject to any right which may be found to exist under the first application. As was said by the secretary in an appeal from the commissioner, in the case of Frederick L. Gilbert et al., 35 Land Dec. Dep. Int. 422–424, where a soldier's additional application was involved:

"The local officers being without authority to act upon them, they are permitted to accept them when presented prior to the allowance of entry by your office, and all rights thereunder attach in the order of the filing of the respective applications in the local office. It would therefore be manifestly inequitable in those cases where applications were properly filed and accepted to permit a substitution of rights to the prejudice of the rights of applicants attaching subsequently to the filing of the original application but prior to the filing of the application to substitute another right in lieu thereof, * * * where each of the respective rights asserted is based upon naked applications independent of any superior or controlling equity."

It was further said in the case:

"But after entry has been allowed by your office, until the same is canceled no rights are gained by the filing of other applications therefor, and the local officers should refuse to accept them."

The case just cited is a clear statement of the distinction recognized by the Department of the Interior between a soldier's additional application and the entry itself.

The conclusion reached is that the decree of the Circuit Court for the District of Minnesota was right, and it is affirmed.

SANBORN, Circuit Judge (dissenting). The application of Robinson filed on January 24, 1901, to enter the land in question and to pay for it with the Carroll additional homestead certificate, was noted on the plat by the local land officers on that day. The application and notation did not effect a completed entry; but, so far as the rights of Robinson were concerned, they were equivalent to an entry. They protected his preference right to enter the land against all other parties as effectually as an entry would have done, and they prevented the appropriation of the lands by the Santa Fé Company or any other applicant until the application was finally rejected on May 13, 1907. They differed from a completed entry only in this: That the junior applicant might acquire a preference right of entry against others but not against Robinson during the pendency of his application, while such a junior applicant could not acquire such a preference right after an entry.

The decision of the register and receiver on July 15, 1905, that the Carroll additional certificate was invalid was followed on July 27, 1905, by a petition of Robinson that he might be granted 30 days in which to "rescrip the above-mentioned tract." This petition is to be read in the light of the rule and practice which will be shown to have existed in the Land Department at that time to permit an applicant whose additional homestead certificate proved defective to substitute

a valid certificate in its place and to support his original application thereby. The petition was not for leave to make another application for the land. It was to substitute another additional homestead certificate as payment for the land in support of his original application. These additional homestead certificates are, like cash, bounty land warrants, Sioux scrip, and agricultural college scrip, mere means by which the government may be paid for the lands sought by the applicants. The Acting Commissioner of the Land Office so understood the petition, for his answer to it was not a cancellation, but a maintenance, of Robinson's original application on condition that within 30 days after notice to him he should file a substituted additional homestead certificate. The commissioner said in his instruction to the register and receiver:

"You will also notify the applicant that he will be allowed 30 days from notice hereof in which to file a proper substitute for the right hereby rejected, and, if at the expiration of said period the applicant has not filed such substitute you are directed to hold the said tract subject to entry from that time by the first qualified applicant."

Within the 30 days after notice and on October 4, 1905, Robinson filed his substitute, the Heath additional homestead certificate, and it was accepted, and Robinson was permitted to enter the land and to pay for it, not on a new, but on his old, application, and a final certificate was issued to him thereon on March 2, 1906.

But on July 11, 1905, before the substituted certificate had been filed, the Santa Fé Company had applied to select this land, and it contended and finally persuaded the officers of the Land Office to hold that Robinson's substitution of a valid for an invalid additional homestead right—in other words, a good for bad payment for the land—was not permissible and to issue the patent to the Santa Fé Company for that reason. Robinson insists that this decision and act were violative of an established rule and practice of the Land Department to permit such substitutions, which were and had long been in existence on October 5, 1905, when he filed his substituted additional and until after he had completed his entry. This contention presents the decisive question of law in the case in hand.

A rule and a settled practice of the officers of the Land Department relative to the acquisition of the public lands is a rule of property in accordance with which applicants have the legal right to have their rights to these lands which are acquired under such a rule determined, and neither the Secretary of the Interior nor the Commissioner of the Land Office may lawfully deprive them of this right by a subsequent abrogation of the rule or the practice and the promulgation of a different one. The new rule and practice may govern rights acquired after its promulgation; but the rule of property in existence at the inception of the rights in question determines their validity and extent. Retroactive decisions and rules of the officers of the Land Department, as well as those of the courts, are as vicious and ineffectual as retroactive laws. Germania Iron Company v. James, 89 Fed. 811, 817, 32 C. C. A. 348, 354.

What, then, was the rule and practice of the Land Department as to the substitution of additional homestead certificates on October

4, 1905, when Robinson filed his substitute? It was and still is the rule and practice of the Land Department to permit the substitution of valid bounty land warrants and agricultural college scrip for defective warrants and scrip offered in payment for land, and soldier's additional homestead certificates are of the same nature. Hussman v. Berry, 6 Land Dec. Dep. Int. 375; Hussman v. Durham, 165 U. S. 144, 17 Sup. Ct. 253, 41 L. Ed. 664; Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179. Robinson alleged in his bill that, when he filed his substituted additional homestead right, a like rule and practice existed, and had existed for many years, to the effect that, when the additional homestead of an applicant proved defective, a valid additional homestead right might be substituted for it in support of the original application so that the substituted additional homestead related back to the date of the original application and prevailed over junior applications which were necessarily made subject to this rule. The defendant answered this averment that prior to March 24, 1906, "there was a rule and practice prevailing in the department that, upon the rejection of a soldier's additional homestead right to make an entry of public lands, the said applicant might apply for and take and enter said lands with another valid soldier's additional right; but this defendant alleges that said rule and practice was limited in its application to those cases where no other adverse right was pending at the time the so-called soldier's substituted additional right was offered at the local land office in lieu of other scrip which had been rejected."

The fact will be noted that the issue was whether this rule of property existed prior to March 24, 1906. It was immaterial what the rule and practice were after this date, or indeed after October 4, 1905, when Robinson filed his substituted additional homestead certificate, because then all the rights of the parties against each other had become fixed. The defendant admitted by its answer that such a rule and practice did exist prior to March 24, 1906, but averred that this rule of property did not apply to cases in which there was a junior application pending when the substituted additional certificate was presented. This answer was a confession and avoidance, and the burden was upon the defendant under a familiar rule to prove the avoidance, to prove that cases in which a junior application was pending were excepted from this rule and practice prior to March 24, 1906. In support of this allegation he produced no evidence whatever, no rule, no practice, no decision. On the other hand, these facts were established by undisputed evidence: On October 14, 1898, Robeson T. White applied to enter a tract of land upon the additional homestead right of one Carver. Thereupon William Moran applied to enter the same land as a homestead. On October 2, 1899, after the application of Moran had been filed, and while both applications were pending, White applied to substitute the additional homestead right of Pugh for that of Carver which he had reason to fear was defective. The Commissioner of the General Land Office, upon consideration of his right so to do, decided that, "the instant White signified his election to withdraw his application as the assignee of Winifred Carver, the right of any actual bona fide settler upon the land under the home-

stead law would attach," and he sustained the claim of Moran. In re Robeson T. White, 30 Land Dec. Dep. Int. 61, 63. It is true, as stated in the opinion of the majority, that White had a preference right of entry when he made his original application to enter the land under the homestead right of Carver. But this preference right of entry was nothing but a right to enter the land by paying for it with an additional homestead, or cash, or other admissible means of payment within 30 days after October 13, 1898. His application to enter and pay for the land with the Carver additional gave him no better right after these 30 days expired—that is to say, after November 12, 1898—than Robinson had after he made his original application. 21 Stat. 141, § 2. The right of each to enter depended upon his payment with his additional homestead rights, and each was an applicant, and not an entryman. Robinson by virtue of his application had as valid a preference right of entry as White had after November 12, 1898.

From the decision of the commissioner in favor of Moran, White appealed to the Secretary of the Interior, and these are the words of Acting Secretary Ryan pertinent to the issue of the rule and practice to substitute a valid for an invalid additional in support of an original application in the face of a junior application:

"It does not appear that White at any time withdrew, abandoned, or receded from his original application to enter. Being advised that there was infirmity in proofs of the Carver additional right, he offered to substitute the Pugh right. The intention to claim benefit of and attempt to exercise his preference right, earned by his successful contest of McCrimmon's entry. was the essential part of the transaction. In what manner or by what consideration the government should be satisfied for the land was only matter of incident to the essential and principal thing—the exercise of his preference right of entry. Had, for instance, the transaction been one of private entry on location of a land warrant, scrip, or payment of money, and it transpired that innocently a forged warrant, or scrip, or counterfeit money was paid, the entryman would be allowed to substitute other good warant, scrip, or money, without prejudice to his entry.

"Since it has been decided that soldiers' additional rights are simply property, and have lost their personal character, the additional right, as it has reference to acquirement of government land, has, as a logical consequence, become similar in character to a land warrant, scrip, or money. It is simply a form of legal consideration to the government for the title to the land entered. It is not of the substance of the transaction that one right or another right, one piece of scrip or another piece of like scrip be surrendered as the consideration for the entry, so only as a legal consideration some valid additional right is surrendered. * * *

"The offer to locate the Pugh right on the land was not inconsistent with claiming the land by location of the Carver right thereon. Having two rights, White could claim the land under either. If he had reason to apprehend infirmity in one right located on the land, White could properly reinforce or cure his entry by locating another right thereon. As, however, it appears White was moved to locate the second right on the land by errors of the Land Department in the matter of Carver's entries, he should be permitted to withdraw his Pugh right, if it be true, as appears by the record now, that the Carver right was good.

"Your office decision is therefore reversed, the order for hearing vacated, and White will be permitted to protect his preference right and entry thereunder by location on the land of the Pugh right, or any valid additional right, if it should prove to be necessary so to do."

Here was a junior application in favor of which the commissioner had decided this case, and here was the decision of the Secretary of

178 F.—16

the Interior that, if the first additional homestead right proved defective, the Pugh additional homestead right which was presented subsequent to the junior application might be substituted to sustain the original and to defeat the junior claim. This determination of the secretary seems to me to be proof conclusive that on June 9, 1900, when that decision was rendered, cases wherein there were junior applications pending were not excepted from the rule and practice of substitution which was admitted by the answer to prevail.

But this is not all. On February 8, 1905, the commissioner of the General Land Office, in answer to this question, "Where a person who has a pending soldier's additional application for a tract of land becomes convinced that the right or scrip is bad, applies to substitute another piece of same kind of scrip, to wit, soldier's additional, should we receive and transmit such scrip or reject it?" wrote the register and receiver who asked it:

"The answer to this question is provided for in the case of Robeson T. White, 30 Land Dec. Dep. Int. 64, where it is held in effect that an applicant under section 2306, Rev. St., may after due notice that a soldier's additional right, upon which his application is based, is for any reason illegal or invalid, substitute another soldier's additional application as a basis for his original application without waiving any rights acquired by virtue of such original application.

"Referring to your question as to the proper procedure in the case of a relinquishment of a soldier's additional application, after the basis has been declared invalid, and the filing of a new application accompanied by a substituted basis, I will state the situation as follows:

"Where the office holds for rejection an application because of a defective base, and the applicant, after due notice thereof, wishes to retain his rights under his original application, he need not file a new application (Robeson T. White, 30 Land Dec. Dep. Int. 61, supra), but all that is required to preserve his rights under his original application is to file within the time allowed under the rules a substituted basis of the same character as that originally presented, which act will be accepted as a waiver by the applicant of all rights asserted under the original basis and be sufficient to warrant you in immediately forwarding said substituted basis to this office after making proper notations upon your records.

"The office will thereupon take up this substituted basis, and consider it in place of the one theretofore filed."

Let the facts be noted that there was no exception of cases in which there are junior applications pending in these declarations of the established rule and practice, and that the declarations expressly state that they rest on the rule and practice declared in White's Case in which there was a junior application.

On July 19, 1905, the Commissioner of the General Land Office affirmed and applied this rule of property to another case where the substituted additional homestead right was tendered after a junior application had been filed in the case of Charles P. Maginnis. Maginnis had applied to enter the land on October 24, 1899, upon the additional homestead right of Davis. On January 14, 1905, this homestead right was held to be defective and rejected. On April 14, 1905, the Northern Pacific Railway Company selected the land under its grant. On May 19, 1905, Maginnis applied for an extension of time to file a substitute additional homestead certificate for that of Davis, and the commissioner granted the request, and said:

"In the case of Robeson T. White, 30 Land Dec. Dep. Int. 61, it is held in effect that an applicant under section 2306, Rev. St., after due notice that a soldier's additional homestead right, upon which his application is based, is for any reason illegal or invalid, may substitute another soldier's additional homestead right as a basis for his original application without waiving any rights acquired by virtue of such original application.

"In accordance with the case of Robeson T. White, supra, and the case of John C. Ferguson (secretary's decision of October 14, 1904, unreported), the application of Maginnis serves to protect his rights as against other applicants until such time as the case is closed upon the records of this office, and the tender of the selection of the Northern Pacific Railway Company for said tract can confer no right upon the company as against this applicant, but serves to protect it against others.

"The facts presented as reason for an extension of time in which to file a substituted right are deemed sufficient to warrant granting the request.

"You are therefore directed to notify applicant and also his said attorney that he will be allowed 30 days from this date in which to file a substituted right."

The decisions and declarations which have now been recited constitute all the evidence that was produced in this case upon the issue of the prevailing rule and practice on October 4, 1905, when Robinson filed his substituted additional and secured his right to this land. They seem to me to demonstrate the fact that the rule and practice that an original application might be supported by a substituted additional homestead right, and that such an application so supported gave to the applicant a preference right to enter the land over a junior applicant, who presented his application before the substitution had been declared and followed in every case and instruction in which the question had arisen for more than five years prior to October 4, 1905, and there had been no decision, declaration, instruction, or suggestion to the contrary. In accordance with this rule and practice, Robinson's substituted additional, that of Heath, which was filed on October 4, 1905, was accepted by the commissioner, and he directed the local land officers to allow him to enter the land on February 15, 1906, and on March 2d of that year he entered the land, paid the final fee and commissions due upon the entry, and the usual final certificate was issued to him. Because these acts and decisions of the officers accorded with the settled rule and practice of the Land Department in existence when Robinson filed his original application and when he filed his substituted additional homestead right and when he made his final entry and received his final certificate, I am of the opinion that he thereby acquired an equitable title to this land superior to that of the Santa Fé Company, that the subsequent acts and decisions of the officers of the Land Department which deprived him of this equitable title and patented the land to the company constituted a plain error of law, and that he is entitled to a correction of this error and to a decree in his favor to the effect that the defendant below holds the title under the patent in trust for him.

From this conclusion there seems to me to be no logical escape without overruling the decision of this court in Germania Iron Company v. James, 89 Fed. 811, 817, 32 C. C. A. 348, 354, to the effect that the rights of applicants for public lands between themselves are to be determined by the rule of property evidenced by the settled rule and practice of the Land Department at the time when their rights

accrue, and not by some new and contrary rule which the officers afterwards adopt. It is true that after Robinson had entered his land, paid for it, and received his final certificate in accordance with the established rule of property which had existed for more than five years prior to the entry and on March 24, 1906, upon an appeal from the decision of the commissioner which has been recited in the case of Maginnis, the Acting Secretary of the Interior reversed the rule of property which had theretofore always prevailed, and established the new and contrary rule that a junior application should prevail over a senior application supported by a substituted additional homestead right. But in my opinion that decision and the subsequent rule are not material to this case because it ought to be governed by the rule of property in force when the rights of the respective parties attached. By that rule, when the Santa Fé Company filed its application to select this land on July 11, 1905, it acquired no right to it as against Robinson's right under his prior application which he had the legal right to sustain and enforce by his substituted additional homestead right of Heath. There was no reversal or suggestion of variation of that rule until the decision in the Maginnis Case on March 24, 1906, after Robinson had entered and paid for the land according to the law and the settled rule and practice as they then and always theretofore existed.

The suggestion is made that the officers of the Land Department had no power to establish the rule and practice of giving to an applicant a short time after his additional homestead right was found to be defective to provide a valid additional homestead right in lieu of it or to receive the latter in support of his original application in the face of a junior claim. But ample authority to establish and maintain this rule and practice may be found in sections 441, 453 and 2306 of the Revised Statutes (U. S. Comp. St. 1901, pp. 252, 257, 1415), and striking illustrations of the exercise of like powers by those officers in Copp's Public Land Laws 1875, p. 186; Copp's Public Land Laws (Ed. 1882) pp. 478–9; General Circular of 1904, p. 238; and Rule 41, Circular of July 20, 1875; cited in Hussman v. Durham, 165 U. S. 144, 146, 17 Sup. Ct. 253, 41 L. Ed. 664.

On the other hand, the officers of the Land Department were without the power to divest Robinson of his title to this land after he had entered it. His filing of his application, his substitution of the Heath additional for the defective Carroll certificate, his entry and payment for the land, and his receipt of his final certificate, were each and all in strict accord with the law and the settled rule and practice of the department which were then in existence, and the power of the officers of the Land Department does not extend to the taking of property lawfully entered by one applicant and the giving of it to another.

"It cannot be exercised so as to deprive any person of land lawfully entered and paid for. By such entry and payment the purchaser secures a vested interest in the property, and a right to a patent therefor, and can no more be deprived of it by the order of the commissioner than he can be deprived by such order of any other lawfully acquired property. Any attempted deprivation in that way of such interest will be corrected whenever the matter is presented so that the judiciary can act upon it." Cornelius v. Kessel, 128 U. S. 456, 461, 9 Sup. Ct. 122, 32 L. Ed. 482; Bogan v. Mortgage Co., 11

C. C. A. 128, 130, 63 Fed. 192, 195; Germania Iron Company v. James, 89 Fed. 811, 816–818, 32 C. C. A. 348, 353–55; Ballinger v. U. S., 30 Sup. Ct. 338, 54 L. Ed. ——, filed Feb. 21, 1910.

For the reasons which have now been stated, perhaps at too great length, it appears to me that the decree below should be reversed, and a decree for the complainant for the relief prayed in his bill should be granted.